**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

TODD SANDERSON, Individually and on
Behalf of All Others Similarly Situated,
Huntington, New York

                    Plaintiff

    v.

QUALITY CARE PROPERTIES, INC.,
7315 WISCONSIN AVE.
SUITE 550-EAST
BETHESDA, MD  20814
(MONTGOMERY COUNTY)SERVE ON:
CSC-LAWYERS INCORPORATING
SERVICE COMPANY
7 St. Paul St., Ste. 820
Baltimore, MD 21202

MARK S. ORDAN
c/o Quality Care Properties, Inc.
7315 Wisconsin Avenue
SUITE 550-EAST
Bethesda, MD 20814
GLENN G. COHEN
c/o Quality Care Properties, Inc.
7315 Wisconsin Avenue
SUITE 550-EAST
Bethesda, MD 20814

JERRY L. DOCTROW
c/o Quality Care Properties, Inc.
7315 Wisconsin Avenue
SUITE 550-EAST
Bethesda, MD 20814

PAUL J. KLAASSEN
c/o Quality Care Properties, Inc.
7315 Wisconsin Avenue
SUITE 550-EAST
Bethesda, MD 20814

Case No.

**CLASS ACTION COMPLAINT FOR
VIOLATIONS OF SECTIONS 14(a) AND
20(a) OF THE SECURITIES
EXCHANGE ACT OF 1934**

**JURY TRIAL DEMANDED**

#3093241v.1

PHILIP R. SCHIMMEL
c/o Quality Care Properties, Inc.
7315 Wisconsin Avenue
SUITE 550-EAST
Bethesda, MD 20814

KATHLEEN SMALLEY
c/o Quality Care Properties, Inc.
7315 Wisconsin Avenue
SUITE 550-EAST
Bethesda, MD 20814

and

DONALD C. WOOD
c/o Quality Care Properties, Inc.
7315 Wisconsin Avenue
SUITE 550-EAST
Bethesda, MD 20814

   Defendants

## CLASS ACTION COMPLAINT

Plaintiff Todd Sanderson ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.  This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of Quality Care Properties, Inc. ("Quality Care" or the "Company") against the Company and the members of the Company's board of trustees (collectively, the "Board" or "Individual Defendants," and, together with Quality Care, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. 240.14a-9,

1

and Regulation G, 17 C.F.R. § 244.100, in connection with the proposed merger (the "Proposed Merger") between Quality Care and Welltower, Inc. ("Welltower").

2.          On April 25, 2018, the Board caused the Company to enter into an agreement and plan of merger ("Merger Agreement"), pursuant to which each share of Quality Care common stock will be exchanged for $20.75 in cash[1] (the "Merger Consideration").

3.          On June 21, 2018, in order to convince Quality Care shareholders to vote in favor of the Proposed Merger, the Board authorized the filing of a materially incomplete and misleading Definitive Proxy Statement on Schedule 14A (the "Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act. The shareholder meeting is set for July 25, 2018.

4.          While Defendants are touting the fairness of the Merger Consideration to the Company's shareholders in the Proxy, they have failed to disclose certain material information that is necessary for shareholders to properly assess the fairness of the Proposed Merger, thereby rendering certain statements in the Proxy false and/or misleading.

5.          In particular, the Proxy contains materially incomplete and misleading information concerning:  (i) financial projections for the Company; and (ii) certain information regarding the sale process leading up to the Merger Agreement.

6.          It is imperative that the material information that has been omitted from the Proxy is disclosed to the Company's shareholders prior to the forthcoming shareholder vote, so that they can properly exercise their corporate suffrage rights.

7.          For these reasons, and as set forth in detail herein, Plaintiff asserts claims

---

[1]          Quality Care shareholders will also receive the right to receive a per share cash payment of $0.0006 per day during the period beginning on August 25, 2018 through the date the Merger is consummated.

against Defendants for contraventions of (i) Rule 14a-9, and (ii) Regulation G, 17 C.F.R. § 244.100, in violation of Sections 14(a) and 20(a) of the Exchange Act. Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Merger and taking any steps to consummate the Proposed Merger unless, and until, the material information discussed below is disclosed to Quality Care shareholders sufficiently in advance of the vote on the Proposed Merger or, in the event the Proposed Merger is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

9.     Personal jurisdiction exists over defendant Quality Care because it is incorporated in and maintains its principal place of business in Maryland. Personal jurisdiction over each Individual Defendant exists because each has served as a director of Quality Care which is incorporated in Maryland. Personal jurisdiction also exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

10.    Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; and (ii) Quality Care is incorporated and maintains its principal place of business in this District.

#3093241v.1

## PARTIES

11.      Plaintiff is, and at all relevant times has been, a Quality Care shareholder.

12.      Defendant Quality Care is incorporated in Maryland and maintains its principal executive offices at 7315 Wisconsin Avenue, Suite 250-W, Bethesda, Maryland 20814.  The Company trades on the New York Stock Exchange under the ticker symbol: QCP.

13.      Individual Defendant Mark S. Ordan has served as the Company's Chief Executive Officer and Chairman of the Board since October 31, 2016.

14.      Individual Defendant Glenn G. Cohen has served as a director of the Company since October 2016.

15.      Individual Defendant Jerry L. Doctrow has served as a director of the Company since October 2016.

16.      Individual Defendant Paul J. Klaassen has served as a director of the Company since October 2016 and is the current lead independent director.

17.      Individual Defendant Philip R. Schimmel has served as a director of the Company since October 2016.

18.      Individual Defendant Kathleen Smalley has served as a director of the Company since October 2016.

19.      Individual Defendant Donald C. Wood has served as a director of the Company since October 2016.

20.      The Individual Defendants and Quality Care may collectively be referred to as "Defendants."  Each of the Individual Defendants herein is sued individually as well as in his or her capacity as an officer and/or trustee of the Company, and the liability of each arises from the

4

fact that he or she has engaged in all or part of the unlawful acts, plans, schemes, or transactions complained of herein.

## CLASS ACTION ALLEGATIONS

21.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of Quality Care (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

22.     This action is properly maintainable as a class action because:

a.     The Class is so numerous that joinder of all members is impracticable.  As of June 4, 2018, there were approximately 94,196,282 shares of Quality Care common stock outstanding, held by hundreds to thousands of individuals and entities scattered throughout the country.  The actual number of public shareholders of Quality Care will be ascertained through discovery;

b.     There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i)     whether Defendants disclosed material information that includes non-GAAP financial measures without a presentation and reconciliation of the same non-GAAP financial measures to their most directly comparable GAAP equivalent in violation of Section 14(a) of the Exchange Act;

ii)    whether Defendants have misrepresented or omitted material information concerning the Proposed Merger in the Proxy in violation of Section 14(a) of the Exchange Act;

iii)    whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iv)    whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Merger based on the materially incomplete and misleading Proxy.

c.    Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.    Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.    A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

23.     Quality Care Realty Trust is a real estate investment trust ("REIT") that invests in certain skilled nursing and memory care assisted living properties and medical office buildings, as well as a surgical hospital, throughout the United States.

24.     On April 25, 2018, the Company announced the Proposed Merger in a press release that states, in pertinent part:

**Bethesda, MD — April 25, 2018 —** Quality Care Properties, Inc. (NYSE: QCP) ("QCP") today announced that it has entered into an agreement with ProMedica Health System, Inc. ("ProMedica"), under which ProMedica will assume the rights and obligations of QCP pursuant to the original plan sponsor agreement between QCP and HCR ManorCare Inc. ("HCR ManorCare") entered into on March 2, 2018. As a result, ProMedica will acquire HCR ManorCare at the completion of HCR ManorCare's Chapter 11 bankruptcy process.

Separately, QCP entered into a definitive agreement to be acquired by Welltower Inc. (NYSE: WELL) ("Welltower") for $20.75 per share in an all-cash transaction that would close concurrently with the closing of the QCP and ProMedica transaction. The per share acquisition price represents an approximate 64.7% premium to the closing price of QCP common stock on March 1, 2018, the last day of trading prior to QCP's announcement that it had entered into the original plan sponsor agreement to acquire HCR ManorCare, as well as an approximate 17.3% premium to the 60-day volume weighted average price ended April 24, 2018. The QCP Board of Directors has unanimously determined that the transaction is in the best interests of QCP and its shareholders, and will recommend that QCP shareholders approve the transaction.

In addition, ProMedica and Welltower announced a strategic joint venture agreement to facilitate these transactions.

Mark Ordan, QCP's Chief Executive Officer, said, "We are pleased to reach these agreements with ProMedica and Welltower, which provide QCP shareholders with strong, certain and immediate value and position the great team at HCR ManorCare to continue providing high quality care to patients and their families. Since our spin 17 months ago, we have worked through a difficult situation with our principal tenant and navigated industry headwinds that pressured our EBITDA, while under a constraining financing umbrella. Our Board carefully evaluated our standalone prospects and options going forward and determined that this transaction is the best path forward for all of our stakeholders in light of QCP's risks and opportunities. Through these agreements, we have found a unique owner for our skilled nursing and memory care/assisted living facilities with a relatively low cost of capital, an enormous and flexible balance sheet, a

7

large CAPEX commitment to our assets and a vision of long-term value, beyond what QCP could likely deliver on a standalone and risk adjusted basis."

Mr. Ordan continued, "Ensuring the continuation of the highest-quality patient care has always been among our top priorities. We believe the intended capital infusion by ProMedica and Welltower will benefit the well-being of many thousands of patients, residents and employees of HCR ManorCare."

QCP will receive a reverse termination fee of $250 million if ProMedica fails to acquire HCR ManorCare in the bankruptcy proceeding, and QCP will pay Welltower a termination fee of $19.8 million (or $59.5 million, in certain circumstances) if QCP terminates the agreement to accept a superior proposal, in each case subject to the provisions of the agreement.

The ProMedica transaction is subject to approval by the U.S. Bankruptcy Court overseeing HCR ManorCare's Chapter 11 case and other customary closing conditions. The Welltower transaction is subject to approval by QCP shareholders and other customary closing conditions. Each transaction is also, for all practical purposes, cross-conditioned on the occurrence of the other.

The transactions are not subject to a financing condition and are expected to close during the third quarter of 2018.

25.    The Merger Consideration appears inadequate in light of the Company's current financial health.  Indeed, the Merger Consideration represents an approximate *20 percent discount* to the Company's tangible book value per share of $25.85, as reported by a certain media outlet.  Moreover, the Merger Consideration represents an approximate *24 percent discount* to the Company's book value per share as of March 31, 2018.

26.    In sum, it appears that that the Merger Consideration fails to adequately compensate the Company's shareholders in exchange for the assets on the Company's balance sheet.  It is imperative that Defendants disclose the material information they have omitted from the Proxy, discussed in detail below, so that the Company's shareholders can properly assess the fairness of the Merger Consideration for themselves and make an informed decision concerning whether or not to vote in favor of the Proposed Merger.

8

**The Materially Incomplete and Misleading Proxy**

27.        On June 21, 2018, Defendants caused the Proxy to be filed with the SEC in connection with the Proposed Merger.  The Proxy solicits the Company's shareholders to vote in favor of the Proposed Merger.  Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy misrepresents and/or omits both required and material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Merger, in violation of Sections 14(a) and 20(a) of the Exchange Act.

*The Materiality of Financial Projections*

28.        A company's financial projections are material information a board relies on to determine whether to approve a merger transaction and recommend that shareholders vote to approve the transaction.  Here, the financial forecasts were relied on to approve the Merger Agreement and recommend the Proposed Merger to shareholders. The Proxy discloses that the financial projections were prepared by the Company's management and "were made available to the board in connection with its consideration and evaluation of the merger, and to our financial advisors in connection with their financial analyses and opinions."  Proxy at 65.

29.        When soliciting proxies from shareholders, a company must furnish the information found in Schedule 14A (codified as 17 C.F.R. § 240.14a-101).  Item 14 of Schedule 14A sets forth the information a company must disclose when soliciting proxies regarding mergers and acquisitions.  In regards to financial information, companies are required to disclose "financial information required by Article 11 of Regulation S-X[,]" which includes Item 10 of Regulation S-K.  *See* Item 14(7)(b)(11) of 17 C.F.R. § 240.14a-101.

30.     Under Item 10 of Regulation S-K, companies are encouraged to disclose "management's projections of future economic performance that have a reasonable basis and are presented in an appropriate format." 17 C.F.R. § 229.10(b). Although the SEC recognizes the usefulness of disclosing projected financial metrics, the SEC cautions companies to "take care to assure that the choice of items projected is not susceptible of misleading inferences through selective projection of only favorable items." *Id.*

31.     In order to facilitate investor understanding of the Company's financial projections, the SEC provides companies with certain factors "to be considered in formulating and disclosing such projections[,]" including:

(i) When management chooses to include its projections in a Commission filing, *the disclosures accompanying the projections should facilitate investor understanding of the basis for and limitations of projections.* In this regard investors should be cautioned against attributing undue certainty to management's assessment, and the Commission believes that investors would be aided by a statement indicating management's intention regarding the furnishing of updated projections. *The Commission also believes that investor understanding would be enhanced by disclosure of the assumptions which in management's opinion are most significant to the projections or are the key factors upon which the financial results of the enterprise depend and encourages disclosure of assumptions in a manner that will provide a framework for analysis of the projection.*

(ii) Management also should consider whether disclosure of the accuracy or inaccuracy of previous projections would provide investors with important insights into the limitations of projections. In this regard, *consideration should be given to presenting the projections in a format that will facilitate subsequent analysis of the reasons for differences between actual and forecast results.* An important benefit may arise from the systematic analysis of variances between projected and actual results on a continuing basis, since such disclosure may highlight for investors the most significant risk and profit-sensitive areas in a business operation.

17 C.F.R. § 229.10(b)(3) (emphasis added).

32.     As discussed further below, the financial projections here do not provide Quality Care's shareholders with a materially complete understanding of the assumptions and key factors, which shareholders would find material since the Board's recommendation that

shareholders vote in favor of the Proposed Merger was based, in part, on the following:

> That the base merger consideration of $20.75 per share was more favorable to the Company's stockholders than the potential value that might result from other alternatives reasonably available to the Company in light of a number of factors, including the risks and uncertainties associated with such alternatives. Such alternatives that the board considered include: the continued operation of the Company on a stand-alone basis (including the consummation of the QCP-HCR ManorCare transactions in accordance with the initial plan sponsor agreement), a merger with a different buyer, a strategic combination involving a spin-off of HCR ManorCare's Heartland business in a Reverse Morris Trust transaction, divestitures of each component of the Company's business to distinct buyers active in the applicable industry subsectors, and other extraordinary transactions.

Proxy at 43.

33.        Moreover, on June 12, 2018, the Company disclosed that it had received a potential superior offer during the 45-day "go-shop" period. Clearly, shareholders faced with two potential offers would want a materially complete understanding of what the Board was and now is considering in making its recommendation to the Company's shareholders.

### *The Financial Projections are Materially Incomplete*

34.        The Proxy discloses certain financial projections for the Company on pages 65-66. However, the Proxy fails to provide material information concerning the projections, which were developed by the Company's management and relied upon by the Board in recommending that the shareholders vote in favor of the Proposed Merger. Proxy at 65.

35.        Specifically, the Proxy provides values for non-GAAP measures:   (1) Revenues (which appears to exclude certain revenues that would normally be included); and (2) Adjusted EBITDA, but fails to provide line items or reconciliation for any of these metrics. Proxy 66.

36.        First, the Proxy defines Revenues as excluding "revenue from non-core HCR ManorCare rehabilitation operations and non-QCP properties managed by HCR ManorCare[,]" but fails to provide the values of the excluded revenues nor a reconciliation to its most

#3093241v.1

comparable GAAP equivalent.  Proxy 66.

37.    Second, the Proxy discloses that Adjusted EBITDA is defined as "Earnings before interest, taxes, depreciation and amortization, adjusted for Company restructuring costs, consent fees under the Company's senior secured credit facilities, prepayment fees, transaction costs in connection with the Company's announced process of selling 74 non-core skilled nursing/senior housing facilities and additional employee retention costs."  Proxy at 66. Nevertheless, the Proxy does not provide the values of the line items nor a reconciliation to its most comparable GAAP equivalent.  Proxy at 66.

38.    Moreover, the Proxy discloses that both of the Company's financial advisors, Goldman Sachs & Co. LLC ("Goldman Sachs") and Lazard Freres & Co. LLC ("Lazard"), calculated unlevered free cash flows ("UFCF") as part of their respective financial analyses. Proxy at 52, 61.  Nevertheless, the Proxy fails to disclose the projected values of UFCF for either financial advisor, and only provides a definition for the UFCF projections utilized by Lazard. Proxy at 61 ("calculated, beginning with EBITDA, by adding other income, subtracting taxes, capital expenditures and adjusting for changes in working capital, other investments, and other items").

39.    As a result of the Company's incomplete disclosures surrounding the calculation of UFCF by the financial advisors, the Proxy is materially misleading as shareholders cannot determine whether the financial advisors calculated UFCF differently, nor whether the various line items, which are also not disclosed, were treated differently.  As such, this information must be disclosed in order to cure the materially misleading disclosures regarding both the financial projections developed by the Company as well as the projections relied upon by the Company's financial advisors.

#3093241v.1

*The Financial Projections Violate Regulation G*

40.     The SEC has acknowledged that potential "misleading inferences" are exacerbated when the disclosed information contains non-GAAP financial measures[2] and adopted Regulation G[3] "to ensure that investors and others are not misled by the use of non-GAAP financial measures."[4]  More specifically, the company must disclose the most directly comparable GAAP financial measure <u>and</u> a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP.  17 C.F.R. § 244.100.  This is because the SEC believes "this reconciliation will help investors . . . to better evaluate the non-GAAP financial measures . . . [and] more accurately evaluate companies' securities and, in turn, result in a more accurate pricing of securities."[5]

41.     Moreover, the SEC has publicly stated that the use of non-GAAP financial measures can be misleading.[6]  Former SEC Chairwoman Mary Jo White has stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial

---

[2]     Non-GAAP financial measures are numerical measures of future financial performance that exclude amounts or are adjusted to effectively exclude amounts that are included in the most directly comparable GAAP measure. 17 C.F.R. §244.101(a)(1).

[3]     Item 10 of Regulations S-K and S-B were amended to reflect the requirements of Regulation G.

[4]     United States Securities and Exchange Commission, *Final Rule: Conditions for Use of Non-GAAP Financial Measures* (2002), *available at* https://www.sec.gov/rules/final/33-8176.htm.

[5]     *Id.*

[6]     *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures:  The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, http://www.nytimes.com/2016/04/22/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

#3093241v.1

measures (as Quality Care included in the Proxy here), implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation.  Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors. And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data.  I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.  I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[7]

42.    Compliance with Regulation G is mandatory under Section 14(a), and non-compliance constitutes a violation of Section 14(a).  Thus, in order to bring the Proxy into compliance with Regulation G, Defendants must provide a reconciliation of the non-GAAP financial measures to their respective most comparable GAAP financial measures.

### *The Financial Projections are Materially Misleading and Violate SEC Rule 14a-9*

43.    In addition to the Proxy's violation of Regulation G, the lack of reconciliation, or at the very least the line items utilized in calculating the non-GAAP measures renders the financial projections disclosed materially misleading as shareholders are unable to understand the differences between the non-GAAP measures and their respective most comparable GAAP financial measures.

44.    Such projections are necessary to make the non-GAAP projections included in the

---

[7]    Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html (emphasis added) (footnotes omitted).

Proxy not misleading. Indeed, Defendants acknowledge the misleading nature of non-GAAP projections, as Quality Care shareholders are cautioned that the projections "are subjective in many respects[,]" and "reflect numerous assumptions . . . ." Proxy at 65.

45.     As such, in order to cure the materially misleading nature of the projections under SEC Rule 14a-9 as a result of the omitted information on pages 65-66, Defendants must provide a reconciliation table of the non-GAAP financial measures to the most comparable GAAP measures.

46.     Additionally, the Proxy must disclose the financial projections for UFCF, as calculated by both financial advisors, and the definition of UFCF, as calculated by Goldman Sachs. Without this information, the summaries of the financial analyses are materially incomplete and misleading.

47.     The Proxy is also materially misleading regarding Lazard's prior contacts with the relevant parties to the transaction. More specifically, the Proxy discloses that Lazard has earned prior fees from the Company but fails to disclose whether Lazard has had any material relationships with Welltower. Proxy at 64. This information is not only required by federal securities laws, 17 C.F.R. §229.1015(b)(4), but is also clearly material to shareholders considering "[t]he scope of Lazard's engagement by the Company was limited to advising the board with respect to the fairness, from a financial point of view, to holders of common stock . . . ." Proxy at 64. Shareholders would find it material to know whether Lazard had any potential conflicts while rendering its fairness opinion.

48.      Clearly shareholders would find this information material since the Board's recommendation that shareholders vote in favor of the Proposed Merger was based, in part, on:

15

> The financial analysis of Lazard presented to the board and the fairness opinion of Lazard that, as of April 25, 2018 and based upon and subject to the assumptions, procedures, factors, qualifications and limitations set forth therein, the per share base merger consideration of $20.75 in cash to be paid to holders of common stock, other than the excluded holders, in the merger was fair, from a financial point of view, to such holders, as more fully described below in the section entitled "*The Merger (Proposal 1)—Opinion of Lazard*."

Proxy at 47.

49.    Finally, the Proxy is materially misleading regarding the acquisition proposal received during the "go-shop" period, which as disclosed in the Company's June 12, 2018 press release "could be reasonably expected to lead to a Superior Offer."[8]  More specifically, the Proxy fails to provide any substantive information about the offer by "Financial Sponsor B", and merely provides vague and misleading information regarding the Board's deliberations and that "to the knowledge of the Company, Financial Sponsor B continues to conduct due diligence." Proxy at 44.

50.    First, the Proxy misleads shareholders by not disclosing the terms of Financial Sponsor B's written acquisition proposal.  Proxy at 43-44.  Rather the Proxy misleadingly focuses on the conditions of the offer and the risks associated with those conditions.  Because the Proxy fails to provide the actual substantive terms of the offer, shareholders are being misled into believing that the potential risks outweigh the potential benefits of the offer, despite being told the Board, at the least, determined it was "reasonable expected to lead to a Superior Offer."  It strains credulity to believe that shareholders would not find the potential upside of the "Financial Sponsor B Proposal" as material or more material than the potential downside, which is conveniently all that is disclosed in the Proxy.

51.    Without this information, the Company's shareholders are being misled by the

---

[8] https://www.sec.gov/Archives/edgar/data/1677203/000110465918039499/a18-15211_1ex99d1.htm

Defendants' selective disclosures surrounding the proposal and are unable to determine whether the proposal's potential upside outweighs the disclosed potential downsides. This information is clearly material to shareholders considering that the Board has "not changed its recommendation", which is based in part on:

> That the base merger consideration of $20.75 per share was more favorable to the Company's stockholders than the potential value that might result from other alternatives reasonably available to the Company in light of a number of factors, including the risks and uncertainties associated with such alternatives. Such alternatives that the board considered include: the continued operation of the Company on a stand-alone basis (including the consummation of the QCP-HCR ManorCare transactions in accordance with the initial plan sponsor agreement), a merger with a different buyer, a strategic combination involving a spin-off of HCR ManorCare's Heartland business in a Reverse Morris Trust transaction, divestitures of each component of the Company's business to distinct buyers active in the applicable industry subsectors, and other extraordinary transactions.

Proxy at 44-45.

52.    In sum, the Proxy independently violates: (i) Regulation G, which requires a presentation and reconciliation of any non-GAAP financial measure to its most directly comparable GAAP equivalent; and (ii) Rule 14a-9, since the material omitted information renders certain statements, discussed above, materially incomplete and misleading. As the Proxy independently contravenes the SEC rules and regulations, Defendants violated Section 14(a) and Section 20(a) of the Exchange Act by filing the Proxy to garner votes in support of the Proposed Merger from Quality Care shareholders.

53.    Absent disclosure of the foregoing material information prior to the special shareholder meeting, Plaintiff and the other members of the Class will be unable to make a fully-informed decision regarding whether to vote in favor of the Proposed Merger, and are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

17

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act
and 17 C.F.R. § 244.100 Promulgated Thereunder)**

54.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

55.    Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

56.    As set forth above, the Proxy omits information required by SEC Regulation G, 17 C.F.R. § 244.100, which independently violates Section 14(a). SEC Regulation G, among other things, requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure, and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure. 17 C.F.R. § 244.100(a).

57.    The failure to reconcile the numerous non-GAAP financial measures included in the Proxy violates Regulation G and constitutes a violation of Section 14(a).

## COUNT II

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act
and Rule 14a-9 Promulgated Thereunder)**

58.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

#3093241v.1

59.     SEC Rule 14a-9 prohibits the solicitation of shareholder votes in proxy communications that contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]"  17 C.F.R. § 240.14a-9.

60.     Regulation G similarly prohibits the solicitation of shareholder votes by "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure . . . contains an untrue statement of a material fact or *omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure . . . not misleading*."  17 C.F.R. § 244.100(b) (emphasis added).

61.     Defendants have issued the Proxy with the intention of soliciting shareholder support for the Proposed Merger.  Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things, the financial projections for the Company.

62.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

63.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading.

19

The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Merger.

64.     The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.

65.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

66.     Quality Care is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

67.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Merger.

68.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT III

### (Against the Individual Defendants for Violations
of Section 20(a) of the Exchange Act)

69.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

70.     The Individual Defendants acted as controlling persons of Quality Care within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Quality Care, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

71.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

72.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Merger.  They were thus directly involved in preparing the Proxy.

73.     In addition, as described herein and set forth at length in the Proxy, the Individual

21

Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

74.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

75.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

76.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.     Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholders vote on the Proposed Merger or consummating the Proposed Merger, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

C.      Directing the Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

D.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses;

E.      Granting such other and further relief as this Court may deem just and proper.


## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated:  June 25, 2018

**TYDINGS & ROSENBERG LLP**
*/s/ Daniel S. Katz*
John B. Isbister, Federal Bar No. 00639
Daniel S. Katz, Federal Bar No. 01148
One East Pratt Street
Suite 901
Baltimore, MD 21202
Telephone: (410) 752-9700
FAX (410) 727-5460
Email: jisbister@tydingslaw.com
Email: dkatz@tydingslaw.com

*Counsel for Plaintiff*

**OF COUNSEL:**

**FARUQI & FARUQI, LLP**
Nadeem Faruqi
James M. Wilson, Jr.
685 Third Ave., 26th Fl.
New York, NY 10017
Telephone: (212) 983-9330
Email: nfaruqi@faruqilaw.com
Email: jwilson@faruqilaw.com


*Counsel for Plaintiff*